1
2
3
4                          UNITED STATES DISTRICT COURT
5                        NORTHERN DISTRICT OF CALIFORNIA
6
7   GARY RICHARD LAWMAN,                    Case No.  15-cv-01202-DMR
              Plaintiff,
8
9        v.                                 ORDER ON DEFENDANTS' MOTION
                                            FOR SUMMARY JUDGMENT AND
10  CITY AND COUNTY OF SAN                   PLAINTIFF'S MOTION TO AMEND
    FRANCISCO, et al.,                       THE COMPLAINT
11            Defendants.                    Re: Dkt. Nos. 38, 69

12         Plaintiff Gary Richard Lawman, through his guardian ad litem Richard de Villiers, filed

13  this civil rights action under 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), and

14  state law claiming that he suffered injuries following a December 2011 arrest.  He asserts claims

15  against the City and County of San Francisco ("CCSF"); San Francisco Police Chief Greg Suhr;

16  San Francisco Police Department ("SFPD") Officers Phillip M. Gordon, Glen Paul Minioza, Brian

17  W. Kneuker, Sgt. Carlos Gutierrez, and Sgt. Craig F. Tom; San Francisco Sheriff's Department

18  ("SFSD") Deputies Patrick F. Pene, Julio C. Palencia, Andrew N. Brown, Senior Deputy Paul E.

19  Rapicavoli, and Sgt. Matthew M. O'Shea; CCSF Sheriff Michael Hennessey; and CCSF Nurses

20  Roel L. Lapitan and Frank Latko.

21         Before the court are Defendants' motion for summary judgment and Plaintiff's motion for

22  leave to amend the complaint.  [Docket Nos. 38 (Defs.' Mot. for Summ J.); 69 (Pl.'s Supp. Brief),

23  70 (Defs.' Supp. Brief).]  The court conducted a hearing on December 17, 2015 and ordered the

24  parties to submit supplemental briefing.  Having considered the parties' argument and

25  submissions, and for the reasons stated below, Defendants' motion is GRANTED IN PART AND

26  DENIED IN PART.  Plaintiff's motion for leave to amend is DENIED.

27
28

United States District Court
Northern District of California

## I.    BACKGROUND

### A.  Factual Background

The facts recounted below are undisputed, unless otherwise noted.

#### 1.  Lawman's Arrest, Incarceration, and Release

Plaintiff Gary Lawman was in San Francisco on the night of December 31, 2011.
Sometime after 9:00 p.m., Lawman entered the Four Seasons Hotel on Market Street in order to gain access to the Four Seasons Residences.  He attempted to board secure elevators that can only be operated with a key or fob.  Concierge John Rodie asked if he could help Lawman, who responded that he needed to "get to the penthouse."  Even though Lawman could not identify a specific penthouse or resident, he repeatedly insisted that Rodie send him up to the top penthouse. Rodie refused to allow him to use the elevator without more information.  According to Rodie, Lawman was casually dressed and "pretty clean-cut," and his demeanor was "cocky; kind of sarcastic."  Lawman eventually sat down on a bench by the elevators.  After a short time, he approached Rodie at his desk to ask him for a bottle of water.  When Rodie offered him one, Lawman said that he wanted Rodie to serve him the bottle on a silver platter.  At that point, Rodie called security since Lawman was refusing to answer his questions and "had no business there."

Rodie, who came within two to three feet of Lawman, did not smell alcohol on him and did not believe he was drunk.  According to Rodie, Lawman was steady on his feet and was speaking clearly and at a normal pace.  His eyes were not bloodshot, his eyelids were not drooping or heavy, and he was not sweating.  However, given Lawman's behavior, Rodie thought he might be under the influence of narcotics.

Security guard John Flores responded to Rodie's call.  According to Flores, Lawman was rude and acting "kind of weird," and refused to leave.  Flores asked Lawman if he was visiting a resident.  Lawman denied that he was visiting a resident and told Flores words to the effect of "You don't belong here.  Get out of here."  Lawman then told Flores to get him a cup of water. Flores, who receives periodic training on how to detect intoxication and deal with intoxicated hotel guests, did not believe that Lawman was drunk.  He came within five to eight feet of Lawman and did not smell alcohol on him.  He did not observe Lawman stumbling, sweating, or

slurring his speech. He also denied that Lawman had bloodshot eyes or heavy eyelids. Flores soon called the police for assistance with removing Lawman from the premises. He did not tell the police that Lawman was intoxicated.

SFPD officers, including Defendants Gordon and Minioza, were dispatched to the Four Seasons at approximately 9:20 p.m. When they arrived, Flores explained to the officers that Lawman had no business there and was refusing to leave. The officers did not ask Flores any questions before speaking directly to Lawman. They did not speak with Rodie at all. According to Flores, one of the officers asked Lawman what he was doing there, and asked Lawman to get up and leave. Flores does not recall any of Lawman's specific statements to the officers, but described Lawman as rude. Similarly, Rodie described Lawman's behavior toward the officers as belligerent. The officers lifted Lawman to his feet and walked him out of the building to a police van parked a few hundred feet away. Flores observed that Lawman walked steadily the whole way.

Gordon arrested Lawman for public intoxication in violation of California Penal Code section 647(f). Officers are not required to prepare a police incident report if arresting an individual for public intoxication. Instead, they fill out a Public Intoxication Report, which appears to be a 5" by 7" card which contains boxes for capturing basic information, "check off" boxes for the officer's physical observations, and a small area in which the officer can provide a brief narrative description. *See, e.g.,* Bers Decl. Ex. D (Public Intoxication Report). Gordon completed a Public Intoxication Report for Lawman's arrest, and signed it under oath. Gordon checked boxes indicating that Lawman exhibited a flushed face, drooping eyelids, slow and slurred speech, and a moderate odor of alcohol. Bers Decl. Ex. D. Gordon also handwrote the following observations:

> I was dispatched to 757 Market St regarding an intoxicated trespasser. I contacted Richard [sic] Lawman. Lawman refused to leave. He smelled heavily of alcoholic beverage and could not answer my questions. I determined Lawman was unable to care for himself as a result of his intoxication.

*Id.* Gordon obtained approval for the arrest from Defendant Tom, but it is not clear whether Tom personally observed Lawman. Defendant Kneuker transported Lawman to County Jail 1 as a

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1  "release when sober," which is a four-hour minimum detention in a sobering cell.  Gordon has

2  only a vague memory of the entire incident, and Minioza and Kneuker have no recollection of the

3  incident at all.

4  Upon Lawman's arrival at County Jail 1, Defendant Latko, a nurse, performed a triage

5  assessment.  Latko completed a triage report indicating that Lawman's general appearance was

6  unremarkable and noting that Lawman stated that he "has no urgent medical condition."  Bers

7  Decl. Ex. J.  Latko also determined that Lawman was not suicidal and was not using drugs.  Latko

8  did not perform a physical or mental examination.  Lawman was then placed in a sobering cell,

9  where he was observed by nursing staff and deputies four times per hour.  May Decl. Ex. 15 at

10  CCSF_LAWMAN 000012 (Sobering Cell Observation Record).  Lawman's observation record

11  indicates that jail personnel checked on him eleven times over a four hour period, in

12  approximately fifteen minute intervals.  The observation record contains no entries of unusual

13  behavior.  *Id.*  One of Lawman's sobering cell mates, M. M.,[1] recalls that Lawman was "dressed

14  nicely but had peanut butter smeared on him."  He states that Lawman "was acting loopy and

15  restless," but M. M. did not observe signs that Lawman was "under the influence of alcohol, such

16  as slurred speech, bloodshot eyes, droopy eyelids, or smell of alcohol."  M. M. Decl., Nov. 19,

17  2015, ¶ 5.[2]

18  The jail discharged Lawman at 1:40 a.m. on January 1, 2012.  About fourteen hours later,

19  at approximately 3:15 p.m., Flores observed Lawman walking down Market Street in front of the

20  Four Seasons without a shirt or shoes.  Witnesses later saw Lawman walking shirtless and

21  shoeless in lanes of traffic on Highway 80 going eastbound; one reported that he appeared "not all

22  there."  May Decl. Ex. 15 at CCSF_LAWMAN 000023-33 (Traffic Collision Report).  At

23

24  _____

[1] The court uses initials instead of full names where privacy rights are implicated, and where the

25  use of a full name is not relevant to the dispute.

26  [2] Defendants object to the portion of M. M.'s declaration in which he offers his opinion that

27  Lawman was "either mentally ill or on drugs" as improper lay opinion "without any description of
behavior that would support a reasonable inference that plaintiff required immediate medical
care."  Reply at 12 n.14.  Defendants' objection is overruled as moot, since the court does not rely

28  on that portion of M. M.'s declaration in reaching its opinion.

United States District Court
Northern District of California

1  approximately 10:55 p.m., a pickup truck traveling 40-50 miles per hour struck Lawman, who

2  suffered multiple injuries, including severe traumatic brain injury.  Traffic Collision Report at 32;

3  Katz Decl., June 4, 2014, ¶¶ 4, 7.

4      Lawman's injuries affected his short term memory.  His only memory of the events at the

5  Four Seasons is a vague recollection of being in a hotel, near an escalator.  Although he

6  remembers being in a jail cell, he has no memory of being arrested, handcuffed, or questioned at

7  the jail.

8                **2.  Lawman's Condition**

9      In his declaration, medical expert Bruce S. Victor, M.D., opines that Lawman has

10  "longstanding bipolar disorder."  According to Dr. Victor, Lawman was experiencing a manic

11  episode from December 31, 2011 through January 1, 2012, and was not experiencing alcohol

12  intoxication.  Victor Decl. Nov. 20, 2015, ¶¶ 3-4, 6.[3]  Although Defendants do not object to this

13  portion of Dr. Victor's opinion, they counter that psychotherapist Harry Motro, Psy.D., who

14  treated Lawman for one year prior to the incident, never observed Lawman display symptoms of

15  bipolar disorder during treatment.  Lawman had disclosed to Dr. Motro that he had previously

16  received a diagnosis of bipolar disorder, and that Lawman disagreed with that diagnosis.  Dr.

17  Motro diagnosed Lawman with adjustment disorder.

18            **B.  Procedural History**

19      Lawman filed his complaint on December 31, 2013 in San Francisco Superior Court, and

20  successfully moved for appointment of a guardian ad litem.  Defendants removed the action to this

21  court on March 13, 2015.  In his first amended complaint, Lawman alleges the following causes of

22  action: 1) 42 U.S.C. § 1983 ("section 1983") claim for wrongful arrest based on the Fourth

23  Amendment against Gordon, Minioza, Kneuker, Gutierrez, and Tom; 2) section 1983 claim for

24  deliberate indifference based on the Fourteenth Amendment against Pene, Palencia, Brown,

25  Rapicavoli, O'Shea, Lapitan, and Latko; 3) section 1983 claim for municipal liability against

26

27  ───────────────
[3] Defendants object to portions of Dr. Victor's declaration.  However, Defendants do not object to
28  Dr. Victor's opinion that Lawman has bipolar disorder and was experiencing a manic episode on
the dates in question.  *See* Reply at 5 n.6.

CCSF, Suhr, and Hennessey; 4) violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, against all Defendants; 5) violation of California Government Code section 845.6 against all Defendants; 6) violation of California's Bane Act, California Civil Code section 52.1 against all Defendants; 7) negligence against all Defendants; and 8) false arrest/imprisonment against all Defendants.  [Docket No. 1-25.]

In his opposition to Defendants' motion for summary judgment, Plaintiff requested leave to amend his complaint to allege a section 1983 claim for failure to render medical care based on the Fourth Amendment.  At the December 17, 2015 hearing, the court ordered the parties to submit supplemental briefing on Plaintiff's motion to amend, which the parties timely filed.

## II.   MOTION FOR SUMMARY JUDGMENT

### A.  Legal Standards

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant.  *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted).  A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor.  *Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 248.  The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact.  *See id.* at 249.

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists.  *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citations omitted).  In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice.  *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738

United States District Court
Northern District of California

(9th Cir. 1979).  Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on the motion.  *Scott*, 550 U.S. at 380.

### B.  Analysis

#### 1.  Claims and Defendants No Longer at Issue

In his opposition, Lawman concedes his Fourteenth Amendment deliberate indifference claim, section 845.6 claim against Gordon and Minioza, and all claims against Latko and Lapitan. These claims are accordingly dismissed with prejudice.  Lawman also concedes that his ADA claim is properly asserted only against CCSF, and not the individual defendants.  Therefore, his ADA claim as to all of the individual defendants is dismissed with prejudice.

In his opposition, Lawman failed to provide any evidence of the involvement of Sheriff Hennessey, Chief Suhr, Sergeant Gutierrez, or Sergeant Tom, and does not appear to oppose Defendants' motion for summary judgment as to those individuals.  Accordingly, summary judgment is granted as to all claims against them.

#### 2.  Wrongful Arrest

Defendants move for summary judgment on Lawman's claims for unlawful arrest and false arrest/false imprisonment on the grounds that probable cause supported his arrest.  In the alternative, they argue that they are entitled to qualified immunity.

##### a.  Whether Lawman's Arrest Was Supported by Probable Cause

"Under the Fourth Amendment, a warrantless arrest requires probable cause."  *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Michigan v. Summers*, 452 U.S. 692, 700 (1981)).  "Probable cause exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested."  *Id.* (citing *Beck v. Ohio,* 379 U.S. 89, 91 (1964)).  "Alternatively, this court has defined probable cause as follows: when 'under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime.'"  *Id.* (citing *United States v. Smith,* 790 F.2d 789, 792 (9th Cir. 1986)) (alteration in original).  While conclusive evidence of

1    guilt is not necessary under this standard to establish probable cause, "[m]ere suspicion, common

2    rumor, or even strong reason to suspect are not enough." *McKenzie v. Lamb*, 738 F.2d 1005, 1008

3    (9th Cir. 1984) (citing *Henry v. United States*, 361 U.S. 98, 101 (1959)). "Probable cause is

4    lacking if the circumstances relied on are susceptible to a variety of credible interpretations not

5    necessarily compatible with nefarious activities." *Gasho v. United States*, 39 F.3d 1420, 1432 (9th

6    Cir. 1994) (citations omitted).

7    "Probable cause must be determined at the time the arrest is made. Facts learned or

8    evidence obtained as a result of a stop or arrest cannot be used to support probable cause unless

9    they were known to the officer at the moment the arrest was made." *Allen v. City of Portland*, 73

10   F.3d 232, 236 (9th Cir. 1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 482 (1963)).

11   "Where the facts or circumstances surrounding an individual's arrest are disputed, the existence of

12   probable cause is a question for the jury." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022

13   (9th Cir. 2008) (citing *McKenzie,* 738 F.2d at 1008).

14   Defendants argue that probable cause existed to arrest Lawman for trespassing under

15   California Penal Code section 602.1(a) and/or section 602(o), as well as public intoxication under

16   Penal Code section 647(f).

### i.   Trespassing

18   Lawman argues that Defendants should not be permitted to seek summary judgment based

19   on a trespassing theory of arrest. He asserts that he conducted virtually no discovery on that

20   theory, because Defendants did not identify trespassing in their interrogatory response when asked

21   to state all facts supporting their contention that Defendants had probable cause to arrest Lawman.

22   *See* May Decl. Ex. 1 (response to interrogatory 3); Ex. 20 (letter to defense counsel requesting

23   supplementation of discovery responses). Instead of providing a narrative response to the

24   interrogatory, Defendants simply referred to a number of documents, including a Computer Aided

25   Dispatch ("CAD") related to Lawman's arrest and the Public Intoxication Report. Defendants

26   argue that the Public Intoxication Report refers to Lawman as "an intoxicated trespasser," and that

27   the CAD uses "code 602", which denotes "trespass." Accordingly, Defendants contend that

28   Lawman cannot claim unfair surprise.

United States District Court
Northern District of California

The court disagrees.  Federal Rule of Civil Procedure 33 governs interrogatories, and provides that "[e]ach interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath."  Fed. R. Civ. P. 33(b)(3).  An answer to an interrogatory should be complete in itself:

> [A]n answer to an interrogatory must be responsive to the question. It should be complete in itself and should not refer to the pleadings, or to depositions or other documents, or to other interrogatories, at least where such references make it impossible to determine whether an adequate answer has been given without an elaborate comparison of answers.

*Scaife v. Boenne*, 191 F.R.D. 590, 594 (N.D. Ind. 2000) (citations omitted).  "Incorporation by reference is not a responsive answer."  *Id.* (quoting *Cont'l Ill. Nat. Bank & Trust Co. of Chicago v. Caton*, 136 F.R.D. 682, 686 (D. Kan. 1991)).  A party's interrogatory response may refer to business records or abstracts only "if the burden of deriving or ascertaining the answer will be substantially the same for either party."  Fed. R. Civ. P. 33(d).  Here, Defendants' interrogatory response listing various documents was not proper under Rule 33(d).

Moreover, the documents identified in the interrogatory response failed to put Lawman on notice of Defendants' trespass theory.  The Public Intoxication Report is the SFPD's official record supporting Lawman's arrest for violating Penal Code section 647(f).  It cannot be used to document an arrest for trespass, and it does not contain any facts about trespassing.  As to the CAD, the court cannot find a reference to code "602," and there is no record evidence to support Defendants' claim that "602" is the SFPD code to denote a suspected trespass.  Defendants offer no other evidence to demonstrate that Lawman had notice of their trespass theory prior to the filing of their summary judgment motion.  Had Defendants properly responded to the interrogatory with a narrative that identified their trespass theory, Plaintiff would have understood their position and could have taken appropriate follow-up discovery.  Since Defendants' improper discovery response did not put Lawman on notice of that contention, the court declines to consider Defendants' arguments on trespassing and denies Defendants' motion for summary judgment motion as to that theory.

### ii.  Public Intoxication

United States District Court
Northern District of California

United States District Court
Northern District of California

1  California Penal Code section 647(f) provides that a person who engages in the following

2  conduct is "guilty of disorderly conduct, a misdemeanor":

3          [w]ho is found in any public place under the influence of
           intoxicating liquor, any drug, controlled substance, toluene, or any
4          combination of any intoxicating liquor, drug, controlled substance,
           or toluene, in a condition that he or she is unable to exercise care for
5          his or her own safety or the safety of others . . .

6  Cal. Pen. Code § 647(f).  Defendants argue that under the totality of the circumstances, a

7  reasonable officer could have concluded that Lawman was intoxicated in public.  They point to the

8  Public Intoxication Report in which Gordon wrote that Lawman "smelled heavily of alcoholic

9  beverage" and indicated that Lawman had a flushed face, drooping eyelids, and slow and slurred

10  speech.

11         Viewing the evidence in the light most favorable to Lawman, the court finds that a

12  reasonable jury could conclude that Gordon lacked probable cause to arrest Lawman for public

13  intoxication.  Gordon's observations and statements in the Public Intoxication Report are directly

14  contradicted by Rodie and Flores, the two witnesses who observed Lawman immediately before

15  the police arrived.  Specifically, Rodie testified that Lawman's eyes were not bloodshot, his

16  eyelids were not drooping or heavy, and he spoke clearly and at a normal pace.  Flores also denied

17  that Lawman had bloodshot eyes or heavy eyelids, and did not observe Lawman slurring his

18  speech.  Both witnesses were in relatively close proximity to Lawman, and neither smelled alcohol

19  on Lawman.[4]  Both witnesses, including Flores, who received training on how to detect

20  intoxication, did not believe that Lawman was drunk.  Given the genuine dispute of material facts

21  regarding Lawman's appearance and comportment, a jury must decide whether the arrest for

22  public intoxication was supported by probable cause.[5]

23  _____

24  [4] Defendants state that only Rodie testified that he did not smell alcohol on Lawman.  This is
   inaccurate.  Flores also testified "I didn't smell any alcohol."  Flores Dep. 30.

25  [5] Defendants argue that circumstantial evidence of Lawman's history of alcohol abuse supports the
26  conclusion that Lawman was drunk.  Mot. at 5 n.1.  This evidence does not counteract the facts
   elicited from percipient witnesses suggesting that Lawman was not intoxicated on the night in
27  question.  Defendants also argue that Lawman's testimony that he has not been drunk since he was
   17 years old runs contrary to treatment records that indicate that he had a problem with alcohol.
28  Lawman objects to these records as inadmissible hearsay and character evidence under Federal
   Rule of Evidence 404(b).  The purpose for which Defendants offer this evidence is not clear, and

United States District Court
Northern District of California

1   In their reply brief, Defendants claim for the first time that probable cause existed to arrest

2   Lawman for being under the influence of narcotics or drugs.  Reply at 1.  In their opening brief,

3   Defendants referred only to alcohol in their discussion of probable cause supporting public

4   intoxication.  *See* Mot. at 9-10; *see also* Mot. at 5 n.1 ("the circumstantial evidence fully supports

5   Plaintiff's being drunk.").  The court will not consider arguments raised for the first time on reply.

6   The court notes, however, that the Public Intoxication Report form specifically states that it is "not

7   to be used for drug intoxication arrests."  Bers Decl. Ex. D.

8   ### b.  Qualified Immunity

9   Defendants also move for summary judgment on Lawman's wrongful arrest claim on the

10   grounds that they are entitled to qualified immunity.

11   The doctrine of qualified immunity protects government officials "from liability for civil

12   damages insofar as their conduct does not violate clearly established statutory or constitutional

13   rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818

14   (1982).  The analysis involves two inquiries.  First, taken in the light most favorable to the

15   plaintiff, the court must ask whether the facts alleged show that the officer's conduct violated a

16   constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If the answer is "no," then the

17   court need not inquire further before ruling that the officer is entitled to qualified immunity.  *Id*.

18   If, however, "a violation could be made out on a favorable view of the parties' submissions," the

19   court must examine "whether the [constitutional] right was clearly established."[6]  *Id*.  "The

20   relevant, dispositive inquiry in determining whether a right is clearly established is whether it

21   would be clear to a reasonable officer that his conduct was unlawful in the situation he

22   confronted."  *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004) (quoting *Saucier*, 533 U.S. at

23   202).  If the law did not put the officer on notice that his conduct would be clearly unlawful,

24

25   the court does not rely on any evidence about his past alcohol use in reaching its opinion.  The
26   court therefore denies the objections as moot.

27   [6] In *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Supreme Court held that a court has the
    discretion to decide "which of the two prongs of the qualified immunity analysis should be
28   addressed first in light of the circumstances in the particular case at hand."

United States District Court
Northern District of California

1  summary judgment based on qualified immunity is appropriate.  *Saucier*, 533 U.S. at 202.

2      The Ninth Circuit has made clear that "when [qualified immunity] depends on genuinely

3  disputed issues of material fact, the court must submit the fact-related issues to the jury." *Ortega*

4  *v. O'Connor*, 146 F.3d 1149, 1154 (9th Cir. 1998); *see also Torres v. City of Los Angeles*, 548

5  F.3d 1197, 1211 (9th Cir. 2008) (noting that where "historical facts material to the qualified

6  immunity determination are in dispute," a jury must decide those facts).  "The determination of

7  whether a reasonable officer could have believed his conduct was lawful is a determination of law

8  that can be decided on summary judgment only if the material facts are undisputed." *LaLonde v.*

9  *Cnty. of Riverside*, 204 F.3d 947, 953 (citing *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th

10 Cir. 1993)).

11     Given the disputed facts regarding Lawman's appearance and comportment at the time of

12 his arrest, a jury could conclude that Lawman was not intoxicated, but that Gordon recorded

13 inaccurate observations on Lawman's Public Intoxication Report in order to make an expedient

14 New Year's Eve arrest, and to avoid having to complete a more time-consuming conventional

15 police incident report.  Such actions would obviously violate Lawman's constitutional rights.

16 Therefore, the court denies summary judgment on qualified immunity on this claim.

17                  **3.  False Arrest/False Imprisonment**

18     With respect to Lawman's claim for false arrest/false imprisonment, Defendants argue that

19 California Penal Code section 847(b) immunizes them from liability because the officers had

20 reasonable cause to believe that the arrest was lawful.

21     Section 847(b) provides that

22         There shall be no civil liability on the part of, and no cause of action
           shall arise against, any peace officer or federal criminal investigator
23         or law enforcement officer . . . acting within the scope of his or her
           authority, for false arrest or false imprisonment arising out of any
24         arrest under any of the following circumstances:

25         (1) The arrest was lawful, or the peace officer, at the time of the
               arrest, had reasonable cause to believe the arrest was lawful.
26

27 Cal. Penal Code § 847(b)(1).  Like qualified immunity under federal law, the statute immunizes

28 officers from false arrest claims where there is "reasonable cause to believe the arrest was lawful,"

United States District Court
Northern District of California

1   which California courts have defined as existing when "the facts known to the arresting officer

2   would lead a reasonable person to have a strong suspicion of the arrestee's guilt."  *O'Toole v.*

3   *Superior Court*, 140 Cal. App. 4th 488, 511 (2006).  California courts look to cases decided under

4   the Fourth Amendment to determine whether reasonable cause existed for purposes of section 847.

5   *Levin v. United Airlines,* 158 Cal. App. 4th 1002, 1017 n.18 (2008); *Blankenhorn v. City of*

6   *Orange*, 485 F.3d 463, 471 (9th Cir. 2007).

7         As explained above, there are genuine disputes about the underlying facts supporting

8   Lawman's arrest for public intoxication.  Summary judgment on section 847(b) immunity for

9   Lawman's false arrest/imprisonment claim is therefore denied.

10         **4.  *Monell***

11         Lawman's third claim is for municipal liability against CCSF pursuant to *Monell v.*

12   *Department of Social Services*, 436 U.S. 658 (1978).[7]  Lawman alleges that CCSF had an informal

13   policy, practice, and custom of encouraging SFPD officers to arrest individuals for violations of

14   section 647(f) without sufficient evidence of intoxication, as a way of streamlining arrests of

15   citizens and avoiding the preparation of complete and accurate police reports.  Am. Compl. ¶ 42.

16   He also alleges that CCSF had an informal policy, practice, and custom of taking individuals into

17   custody who are arrested for public intoxication without performing tests to verify whether the

18   individuals are actually intoxicated and not suffering from a mental health emergency.  Am.

19   Compl. ¶ 46.

20         A municipality may face section 1983 liability if it "'subjects' a person to a deprivation of

21   rights or 'causes' a person 'to be subjected' to such deprivation."  *Connick v. Thompson*, 563 U.S.

22   51, 60 (2011) (quoting *Monell*, 436 U.S. at 692).  However, the municipality may be held liable

23

24   [7] Lawman also pleaded his *Monell* claim against Suhr and Hennessey in their official capacities.
25   As this is redundant of the claim against CCSF, summary judgment is granted as to Lawman's
     *Monell* claim against Suhr and Hennessey.  *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)
26   (**Error! Main Document Only.**"Official-capacity suits . . . 'generally represent only another way
     of pleading an action against an entity of which an officer is an agent.  As long as the government
27   entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects
     other than name, to be treated as a suit against the entity." (citations omitted)).  As noted above,
28   Lawman does not appear to oppose Defendants' motion for summary judgment against Suhr and
     Hennessey.

United States District Court
Northern District of California

"only for '[its] *own* illegal acts.'" *Id.* (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). It cannot be held vicariously liable for its employees' actions. *Id.* (citations omitted). To establish municipal liability, plaintiffs "must prove that 'action pursuant to official municipal policy' caused their injury." *Id.* (quoting *Monell*, 436 U.S. at 691). "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479-80. Official municipal policy includes "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61 (citations omitted). Such policy or practice must be a "moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell*, 436 U.S. at 694). An official municipal policy may be either formal or informal. *City of Saint Louis v. Praprotnik*, 485 U.S. 112, 131 (1988) (acknowledging that a plaintiff could show that "a municipality's actual policies were different from the ones that had been announced.").

An informal policy exists when a plaintiff can "prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Praprotnik*, 485 U.S. at 127 (citation omitted). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996); *see also Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999) ("A single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom.").

In support of his *Monell* claim, Lawman presents nearly 60 complaints to the Office of Citizen Complaints ("OCC") over the past five years from citizens alleging they were wrongfully arrested for public intoxication by the SFPD. May Decl. Ex. 15 at CCSF_LAWMAN 000844-907. These documents are in the form of "Complaint Summary Reports." Bers Decl. Nov. 30, 2015 ("Bers Reply Decl.") ¶ 5. Lawman has evidence of approximately 57 additional OCC

14

1    complaints about wrongful arrests for public intoxication from 2005 to 2010.  May Decl. ¶ 22, Ex.

2    15 at CCSF_LAWMAN 001063-1312 (excerpts of complaints).  Only one of these complaints

3    was sustained.  Bers Reply Decl. ¶ 8 (*see* CCSF_LAWMAN 000859).

4            Lawman also points to testimony by Latko, who served as a nurse at County Jail 1 from

5    November 2002 to December 2013.  County Jail 1 appears to be CCSF's main facility for

6    detainees placed in sobering cells following an arrest for public intoxication.[8]  Latko testified that

7    it was "not unusual" for him to screen section 647(f) arrestees who did not appear to be drunk.

8    When he notified SFPD officers or deputies of his observations, "they never agreed with [him]."

9    They would "verbally note[]" Latko's observations but "it didn't change anything."  When asked

10   about his understanding of section 647(f), Latko testified that he did not believe that it meant that

11   "somebody's so intoxicated they can't care for themselves or others."  Instead, he testified that

12   based on his experience, section 647(f) is "more of a behavioral thing," and that the large majority

13   of people arrested for violating section 647(f) appear to be able to care for their own safety.

14           Lawman also presents evidence that SFPD policy requires that section 647(f) arrestees be

15   given the opportunity to arrange for a blood, breath, or urine test to determine the presence or

16   absence of alcohol at the arrestee's own expense.  May Decl. Ex. 15 at CCSF_LAWMAN 000189.

17   However, arrestees booked into the jail are not advised of their right to arrange for a test, and

18   Latko testified that in his 11 years at County Jail 1, he could not remember a single section 647(f)

19   arrestee receiving a breathalyzer test.

20           In June 2003, in response to citizen complaints, the OCC formally recommended that the

21   SFPD provide preliminary alcohol screening tests to section 647(f) arrestees as a matter of policy.

22   May Decl. Ex. 15 at CCSF_LAWMAN 000063.  The SFPD has not adopted this policy.

23   Numerous officers testified that a policy requiring preliminary alcohol screening tests for section

24

25   _____

     [8] At his deposition, Sheriff's Deputy Matthew Freeman confirmed that he had been designated
26   Defendants' person most knowledgeable "regarding the use and operation of sobering cells."  In
     response to the question, "is it safe to assume that we are talking about knowledge of sobering
27   cells at [County Jail 1]?" he responded in the affirmative.  Freeman Dep. at 8.  Therefore, it is
     reasonable to infer that County Jail 1 is CCSF's primary facility for detaining individuals arrested
28   for violating section 647(f).

United States District Court
Northern District of California

1   647(f) arrestees would not interfere with law enforcement officers' performance of their jobs.[9]

2       Lawman argues that this evidence, taken together, shows "systematic wrongful public

3   intoxication arrests in San Francisco."  Opp'n at 19.  He further contends that CCSF's deliberate

4   indifference is evidenced by its failure to adopt the OCC's recommendation that preliminary

5   alcohol screening tests be given to section 647(f) arrestees.

6       Defendants argue that the evidence of over 100 complaints to the OCC regarding wrongful

7   arrests for public intoxication is not probative of the existence of an improper or unlawful custom,

8   because Lawman fails to provide any evidence that the number of complaints is unusually high.

9   They argue that under Ninth Circuit law, "[c]onsistent with the commonly understood meaning of

10  custom, proof of random acts or isolated events are insufficient to establish custom" for purposes

11  of *Monell* liability.  *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443-44 (9th Cir. 1989),

12  *overruled on other grounds by Bull v. City & Cty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010)

13  (citations omitted).  They also assert that Lawman provides no information about the total number

14  of arrests for violation of section 647(f) from which the court could conclude that the number of

15  complaints is high in proportion to the total number of arrests, citing a Sixth Circuit case, *Thomas*

16  *v. City of Chattanooga*, 398 F.3d 426, 431 (6th Cir. 2005).  In *Thomas*, the Sixth Circuit affirmed

17  summary judgment on a *Monell* claim alleging the existence of an informal police department

18  practice of condoning the use of excessive force by its officers.  The plaintiffs relied on testimony

19  from an expert who opined that such a practice existed in Chattanooga.  However, his opinion was

20  largely based on the number of "formal civil cases alleging use of excessive force by police

21  officers" in the city.  *Id*. at 430.  The court held that the expert "failed to explain how one could

22

23  _____

[9] Lawman also submits the declaration of David A. Dusenbury, his police practices expert, who

24  opines that section 647(f) arrestees should be advised of their right to a test to determine the
    presence or absence of alcohol, and that SFPD officers "systematically abuse Penal Code section

25  647(f)."  Dusenbury Decl., Nov. 20, 2015 ¶¶ 8, 9.  Defendants object to the Dusenbury declaration
    pursuant to Federal Rule of Evidence 702, arguing that his opinions are not based on reliable

26  principles and methods.  The court denies this objection as moot as it does not consider the
    Dusenbury declaration in reaching its decision.

27
    The court denies all remaining evidentiary objections as moot, since it did not rely on any of the

28  evidence to which the parties objected in reaching its decision.

United States District Court
Northern District of California

16

1    evaluate the mere number of complaints in a vacuum to come to a conclusion about the

2    Department's policies," and did not "compare or contrast the number of excessive force

3    complaints made by citizens of Chattanooga with the number of excessive force complaints in

4    similarly-sized cities or in cities with a similarly sized police force." *Id.* at 431.

5         Defendants are correct that Lawman has not submitted evidence to put the total number of

6    OCC complaints into a more meaningful numerical context.  However, a reasonable jury could

7    conclude that the number of actual complaints identified by Lawman amounts to more than a

8    random or isolated problem, especially in light of the fact that individuals arrested for public

9    intoxication generally do not face criminal prosecution after they are released.  *See* Cal. Pen. Code

10   § 647(g) ("A person who has been placed in civil protective custody [for violation of section

11   647(f)] shall not thereafter be subject to any criminal prosecution or juvenile court proceeding

12   based on the facts giving rise to this placement" unless one of three exceptions applies).  A

13   reasonable jury could thus conclude that the number of OCC complaints is an under-representation

14   of the actual scope of wrongful public intoxication arrests in San Francisco, since people who are

15   wrongfully arrested may not have strong incentive to complain about it.

16        Moreover, the evidence of complaints does not stand alone, and must be viewed in

17   connection with Latko's testimony.  Latko, an eleven-year nurse veteran of County Jail 1, testified

18   that "it was not unusual" for him to screen individuals who did not appear to be drunk, and that

19   public intoxication arrests appeared to be based more on a "behavioral thing" than a determination

20   that the individual met the elements of a section 647(f) violation.  Latko could not remember a

21   single arrestee receiving a breathalyzer test during more than a decade spent working at the main

22   sobering cell facility.

23        Defendants argue that Latko's testimony does not create a disputed fact regarding the

24   existence of a custom, policy or practice related to section 647(f) arrests, since he is not trained as

25   a police officer and was not present at the time the arrests were made.  This argument goes to the

26   weight of Latko's testimony, not its admissibility, and the court may not weigh the evidence at

27   summary judgment.  In fact, the Ninth Circuit has reversed a grant of summary judgment where a

28   *Monell* claim was supported by the deposition testimony of a single 911 dispatcher.  In *Navarro v.*

17

*Block*, 72 F.3d 712, 714-715 (9th Cir. 1995), the plaintiffs asserted the existence of a policy and practice of not treating 911 requests for assistance relating to domestic violence as "emergency" calls.  The plaintiffs relied almost exclusively on the testimony of the 911 dispatcher who answered the call of the decedent victim at issue in the case.  The Ninth Circuit found that the dispatcher's testimony about the county's treatment of domestic violence 911 calls satisfied the plaintiffs' burden of establishing a genuine issue for trial.

As to CCSF's refusal to implement the OCC's recommendation that it adopt a testing policy for section 647(f) arrests, Defendants point out that an individual's blood alcohol content would not be determinative of probable cause for violation of section 647(f), since the statute itself contains no blood alcohol level requirement.[10]  This misses the point, for as Lawman argues, implementing a breathalyzer requirement would ensure that a person with no alcohol in his or her system would not be arrested for public intoxication and detained without further investigation or a police report.  Numerous officers testified that such a policy would not interfere with law enforcement duties.

In sum, viewing the evidence in the light most favorable to Lawman, the court concludes that Lawman has established a triable issue as to the existence of a policy, practice or custom regarding the improper arrest of individuals for violation of section 647(f).  Summary judgment on Lawman's *Monell* claim is therefore denied.

### 5.  ADA Claim

Lawman's fourth claim is that CCSF violated the ADA.  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  "Discrimination includes a failure to reasonably accommodate a person's disability."  *Sheehan v. City & Cty. of*

---

[10] Defendants also argue that a breathalyzer would be ineffective because intoxication can be the result of alcohol, drugs, or a combination thereof.  Cal. Penal Code § 647(f).  However, the Public Intoxication Report form explicitly states that it is "not to be used for drug intoxication arrests." (Public Intoxication Report.)  Therefore, a reasonable jury could conclude that implementing a breathalyzer policy could be useful in reducing wrongful arrests for public drunkenness.

*San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014), *reversed in part on other grounds*, 135 S. Ct. 1765 (2015).

The Ninth Circuit has held that the ADA applies to arrests.  *Sheehan*, 743 F.3d at 1232.  In *Sheehan*, the Ninth Circuit recognized two types of ADA claims applicable to arrests: 1) wrongful arrest, "where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity," and 2) reasonable accommodation, where police "fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees."  *Id*. Lawman alleges that both theories apply here. Am. Compl. ¶ 55.

### a.  Wrongful Arrest

To prevail on a theory of wrongful arrest under the ADA, Lawman must prove that 1) he was disabled; 2) the officers knew or should have known he was disabled; and 3) the officers arrested him because of legal conduct related to his disability.  *Orr v. California Highway Patrol*, No. CIV. 2:14-585 WBS, 2015 WL 848553, at *17 (E.D. Cal. Feb. 26, 2015) (citations omitted); *see also Lewis v. Truitt*, 960 F. Supp. 175, 178 (S.D. Ind. 1997).

In their motion, CCSF argues that there is no evidence that Lawman was disabled on the date in question.  On reply, they concede that if a jury believes Dr. Victor's opinion that Lawman has bipolar disorder, it could conclude that Lawman was disabled on December 31, 2011. Therefore, there is a dispute of material fact regarding the first element of Lawman's ADA claim.

CCSF contends that Lawman has not shown that the arresting officers knew or should have known of his disability when they arrested him.[11]  It asserts that the officers' lack of knowledge of

---

[11] Defendants also contend that Lawman cannot pursue a theory of wrongful arrest under the ADA because he fails to demonstrate a prima facie case of disparate impact, arguing that he must show 1) a facially neutral policy that 2) has a significantly adverse or disproportionate impact on a group of persons protected by the ADA.  Mot. at 16.  Defendants offer no support for their assertion that a plaintiff must demonstrate a disparate impact when the claim is based on an allegation that the police wrongly arrested an individual with a disability because they misperceived the effects of the disability as criminal activity.  Defendants cite *Tsombanidis v. West Haven Fire Department*, 352 F.3d 565, 575 (2nd Cir. 2003), but it is inapposite.  *Tsombanidis* involved a challenge to a city's fire code, where the plaintiffs alleged that the regulations adversely impacted individuals who sought to live in a group home for persons in recovery from alcohol addiction.  352 F.3d at 575-76.  It did not involve an ADA wrongful arrest claim.

United States District Court
Northern District of California

United States District Court
Northern District of California

Lawman's bipolar disorder distinguishes this case from *Lum v. County of San Joaquin*, No. CIV. S-10-1807 LKK/DAD, 2012 WL 1027667, at *9-10 (E.D. Cal. March 23, 2012) ("*Lum II*").  In *Lum II*, the defendant officers arrested an individual who had been diagnosed with bipolar disorder for violating section 647(f), even though one of the arresting officers thought he was having a mental health episode and there was evidence that an officer told a witness "we think he's off his meds."  *Id*. at *1.  Moreover, the arrestee informed one of the officers that he was under the care of a doctor for his bipolar condition.  *Id*. at *2.  Here, CCSF states that there is no evidence that the arresting officers knew that Lawman was suffering from a disability, or that "it was obvious" that Lawman was suffering from a disability.

The record contains few facts about what the arresting officers observed about Lawman's appearance, conduct and demeanor when they arrested him.  Gordon and Minioza arrived at the Four Seasons in response to a call for assistance in removing Lawman from the premises.  When they arrived, Flores told them that Lawman, who was casually dressed and "pretty clean-cut," had no business at the Four Seasons and was refusing to leave.  According to witnesses, Lawman's attitude toward the officers was rude and belligerent.  In his Public Intoxication Report, Gordon noted that Lawman "could not answer [his] questions."  Gordon also stated that Lawman "was unable to care for himself as a result of his intoxication," which echoes the section 647(f) requirement that an individual be "in a condition that he or she is unable to exercise care for his or her own safety or the safety of others."  Cal. Pen. Code § 647(f).  The remaining details in Gordon's report—drooping eyelids, slow and slurred speech, and odor of alcohol—are disputed.  After his arrest, Lawman was steady on his feet as he walked to the police van a few hundred feet away from the Four Seasons.

Although it is an extremely close question, the court concludes that a reasonable jury could determine that the arresting officers knew that Lawman was not intoxicated, and should have known that Lawman's strange behavior was caused by a mental disability.  Lawman presented evidence that SFPD officers are trained "to recognize behavioral indicators that may be generally associated with people affected by mental illness," and learn that people with psychiatric disabilities "may be acting in a 'bizarre' manner simply because they are not taking their

prescription medication." May Decl. Ex. 15 at CCSF_LAWMAN 001015, 000288.  Although many of Gordon's observations in the Public Intoxication Report are disputed, his observations that Lawman could not answer his questions and was unable to care for himself are not in dispute. Although the record does not contain the substance of all of the questions that Lawman was unable to answer, Flores recalled that an officer asked Lawman why he was on the hotel premises. Viewing the evidence in the light most favorable to Lawman, and drawing all inferences in his favor, a reasonable juror could conclude that Gordon likely asked Lawman routine questions, similar to the one overheard by Flores.  A reasonable juror could also conclude that the officers, who had been trained in recognizing behavioral indicators of mental illness, should have known that Lawman was displaying symptoms of a disability.  This is based on his inability to answer routine questions, Gordon's conclusion that Lawman "was unable to care for himself," and evidence that Lawman was not intoxicated, and that therefore his strange behavior was not caused by drunkenness.  In sum, a reasonable juror could determine that the officers should have known that Lawman was disabled, and that they arrested him for legal conduct related to his disability. Accordingly, the court denies summary judgment as to Lawman's wrongful arrest theory of ADA liability.

### b.  Reasonable Accommodation

With respect to Lawman's claim that CCSF failed to reasonably accommodate his disability, CCSF argues that this claim fails because it had no notice of Lawman's disability and Lawman never identified a proposed accommodation that CCSF then denied.

"Before a public entity can be required under the ADA to provide a disabled individual an auxiliary aid or service, a public entity must have knowledge of the individual's disability and the individual's need for an accommodation." *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1196 (9th Cir. 2007).  "[T]he entity must have knowledge that the individual is disabled, either because that disability is obvious or because the individual (or someone else) has informed the entity of the disability."  *Id.*  Here, as discussed above, taking the evidence in the light most favorable to Lawman, a reasonable jury could conclude that the arresting officers should have known that Lawman was disabled.

United States District Court
Northern District of California

Lawman alleges that CCSF failed to accommodate him by providing immediate medical care, including mental health services. The problem with Lawman's position is that the facts do not demonstrate that he asked for, or otherwise appeared to require immediate medical care.[12] While a reasonable jury could conclude that Lawman was wrongfully arrested for exhibiting symptoms related to his disability, there is little to suggest that Defendants should have known that Lawman was in distress and required immediate medical attention. Lawman was triaged by Latko at the jail, and Latko determined he was not in immediate need of medical care. The jail cell observation record, which Lawman does not challenge, shows that jail personnel observed him four times per hour thereafter, with no indication of unusual behavior prior to his release. His cell mate's references to Lawman acting "loopy and restless" and having peanut butter smeared on his clothing are too vague to support an inference that Lawman needed immediate medical care. Therefore, a reasonable juror could not conclude on this record that CCSF was on notice of Lawman's need for reasonable accommodation in the form of medical care.[13] The court grants summary judgment on Lawman's ADA claim based on a failure to accommodate.

### 6. California Government Code section 845.6

Lawman's fifth cause of action is for violation of California Government Code section

---

[12] It is not clear whether an individual asserting a failure to accommodate in connection with an arrest must explicitly request an accommodation. In *Sheehan*, the Ninth Circuit analyzed a failure to accommodate claim based on an arrest where the plaintiff did not specifically request an accommodation of her disability. It was undisputed that the responding officers knew that Sheehan had a mental disability. Without addressing this precise issue, the Ninth Circuit concluded that "because the reasonableness of an accommodation is ordinarily a question of fact, . . . [the defendant] [was] not entitled to judgment as a matter of law" on the claim. 743 F.3d at 1233. Therefore, the court must infer that under certain circumstances, a plaintiff may not need to request an accommodation in order to bring a denial of accommodation claim involving an arrest, at least where it is clear to the officers that the person is disabled.

[13] To the extent Lawman contends that the medical treatment he received was inadequate, such a claim is not actionable under the ADA, because "[t]he ADA prohibits discrimination because of disability, not inadequate treatment for disability." *Simmons v. Navajo Cty.*, 609 F.3d 1011, 1022 (9th Cir. 2010). CCSF cannot have violated the ADA by failing to attend to Lawman's medical needs, because "[t]he ADA does not create a remedy for medical malpractice." *Id.* (quoting *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) ("[T]he Act would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners.")).

United States District Court
Northern District of California

845.6.  Section 845.6 provides that a public employee may be liable for failing to summon medical assistance under certain circumstances:

> Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but, except as otherwise provided by Sections 855.8 and 856, a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care.[14]

To state a claim under section 845.6, "a prisoner must establish three elements: (1) the public employee knew or had reason to know of the need (2) for immediate medical care, and (3) failed to reasonably summon such care."  *M. H. v. Cty. of Alameda*, 62 F. Supp. 3d 1049, 1099 (N.D. Cal. 2014) (citation omitted).  "In this manner, section 845.6 imposes a statutory duty to summon medical care."  *Id.* (citation omitted).  By its own terms, section 845.6 only applies to prisoners in custody.  For this reason, Lawman concedes that this claim may only be brought against Kneuker, who transported Lawman to the jail after he was taken into custody, and Sheriff's Department Deputies Pene, Palencia, Brown, Rapicavoli, and O'Shea, who were on duty at County Jail 1 on the date in question.[15]  Lawman asserts that these Defendants knew or had reason to know that Lawman was in immediate need of medical care and failed to take reasonable action to summon such care.  Am. Compl. ¶ 59.

Defendants argue that Lawman's section 845.6 claim fails because there was no evidence that he needed immediate medical care, and no evidence that they had reason to know that Lawman was in need of immediate medical care.  They also argue that they provided medical care

---

[14] "[S]ection 855.8 immunizes the failure to diagnose or to prescribe treatment, and section 856 immunizes the determination whether to confine, for mental illness or addition."  *Johnson v. Cty. of Los Angeles*, 143 Cal. App. 3d 298, 317 (1983) (emphasis removed).

[15] Because Lawman was not a "prisoner" until he entered the jail, Defendants Gordon and Minioza would not be subject to liability under section 845.6.  *See* Cal. Gov't Code § 844 ("For the purposes of this chapter, a lawfully arrested person . . . becomes a prisoner, as a matter of law, upon his or her initial entry into a prison, jail, or penal or correctional facility, pursuant to penal processes.").  The court notes that the record is unclear as to whether Kneuker was present when Lawman entered the jail and became a "prisoner" for purposes of section 845.6, thus subjecting Kneuker to liability under this provision.  However, Defendants appear to concede in their reply brief that Lawman has properly asserted his section 845.6 claim against Kneuker.  *See* Reply at 11.

United States District Court
Northern District of California

1   to Lawman at the jail in the form of the triage by Latko.

2       As to Kneuker, the only record evidence of his involvement with the arrest and detention

3   of Lawman is that he transported Lawman to the jail following his arrest for public intoxication.

4   There is no evidence that Kneuker had any knowledge at all about Lawman's physical or mental

5   condition at the time of transport.  Based on the record evidence, Kneuker can reasonably be

6   imputed with only the knowledge of the reason for Lawman's arrest, i.e. public intoxication.   This

7   is insufficient to create a dispute of material fact about whether Kneuker knew or had reason to

8   know of Lawman's purported need for immediate medical care.

9       As to the Sheriff's Department Deputies, their knowledge of Lawman's behavior is limited

10   to the events at the jail, since there is no evidence that they were aware of Lawman's actions or the

11   arresting officers' observations prior to Lawman's arrest.  These facts are set forth above in the

12   discussion of Lawman's ADA claim for failure to provide a reasonable accommodation in the

13   form of medical care.  On these facts, the court concludes that no reasonable jury could find that

14   the SFSD Deputies knew or had reason to know that Lawman needed immediate medical care.

15       Accordingly, the court grants summary judgment on Lawman's section 845.6 claim.

16       **7.  Bane Act, California Civil Code section 52.1**

17       Defendants next move for summary judgment on Lawman's sixth claim for violation of the

18   Bane Act, California Civil Code section 52.1.  The Bane Act authorizes an action for damages,

19   injunctive relief, and other "appropriate equitable relief" against a person or persons who

20   "interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or

21   coercion, with the exercise or enjoyment by any individual or individuals of rights secured" by

22   federal or state law and the United States or California constitutions.  Cal. Civ. Code § 52.1(a),

23   (b).  "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e.,

24   'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or

25   she had the right to do under the law or to force the plaintiff to do something he or she had the

26   right to do under the law or to force the plaintiff to do something that he or she was not required to

27   do under the law."  *Austin B. v. Escondido Union School Dist.*, 149 Cal. App. 4th 860, 883 (2007)

28   (citation omitted).

1    In order to prevail on his Bane Act claim, Lawman must show that 1) Defendants

2    interfered with his constitutional or statutory rights; and (2) that interference was accompanied by

3    actual or attempted threats, intimidation, or coercion.  *Campbell v. Feld Entm't, Inc.*, 75 F. Supp.

4    3d 1193, 1211 (N.D. Cal. 2014) (citations omitted).  "Only if [Lawman] can first establish that

5    Defendants violated a constitutional or statutory right can the Court consider whether such

6    interference was the product of threats, intimidation, or coercion."  *Id.*

7    At the hearing, Lawman clarified that his Bane Act claim is based solely upon the violation

8    of his Fourth Amendment right to be furnished medical care, and that the violation of that right

9    was accompanied by coercion, i.e. his incarceration in the county jail.  *See* Opp'n at 25-26; Dec.

10   17, 2015 Hr'g Tr. at 41.  He asserts that his incarceration provides the requisite coercion to

11   support his Bane Act claim.  Lawman brings this claim only against Defendants Gordon, Minioza,

12   and Kneuker.  As discussed below, the court denies Lawman's motion for leave to amend the

13   complaint to add a Fourth Amendment failure to render medical care claim, on the ground that

14   such a claim would be futile.  Accordingly, since Lawman cannot establish that Defendants

15   violated his right to be furnished medical care under the Fourth Amendment, his Bane Act lacks a

16   predicate for liability.  Therefore, summary judgment is granted as to Lawman's Bane Act claim.

17   **8. Negligence**

18   Lawman's seventh and final claim is for negligence.[16]  He alleges that the individual

19

20   [16] Lawman alleges that CCSF is vicariously liable for the acts and omissions of its employees
acting in the course and scope of their employment with CCSF.  Am. Compl. ¶ 72 (citing Cal.

21   Gov't Code § 815.2).  Section 815.2 provides

22   (a) A public entity is liable for injury proximately caused by an act
or omission of an employee of the public entity within the scope of

23   his employment if the act or omission would, apart from this section,
have given rise to a cause of action against that employee or his

24   personal representative.

25   (b) Except as otherwise provided by statute, a public entity is not
liable for an injury resulting from an act or omission of an employee

26   of the public entity where the employee is immune from liability.

27   Cal. Gov't Code § 815.2.  Pursuant to this provision, CCSF "is liable for acts and omissions of its
employees under the doctrine of respondeat superior to the same extent as a private employer.

28   Under subdivision (b), [CCSF] is immune from liability if, and only if, [the employee] is
immune."  *Scott v. Cty. of Los Angeles*, 27 Cal. App. 4th 125, 140 (1994).

United States District Court
Northern District of California

1   defendants breached their duties to use reasonable care to avoid injury to him, proximately causing

2   him to suffer catastrophic injuries.  Am. Compl. ¶¶ 70, 71.  "Under California law, '[t]he elements

3   of negligence are: (1) defendant's obligation to conform to a certain standard of conduct for the

4   protection of others against unreasonable risks (duty); (2) failure to conform to that standard

5   (breach of duty); (3) a reasonably close connection between the defendant's conduct and resulting

6   injuries (proximate cause); and (4) actual loss (damages).'"  *Corales v. Bennett*, 567 F.3d 554, 572

7   (9th Cir. 2009) (quoting *McGarry v. Sax,* 158 Cal. App. 4th 983, 994 (2008)).

8       Defendants argue that they are immune from liability for negligence pursuant to two

9   California statutory immunities.  They also argue that Lawman cannot establish a duty of care or

10  causation.

### a.  Statutory Immunities

12      Defendants first argue that California Penal Code section 847(b)(1) immunizes the SFPD

13  Defendants from liability related to Lawman's arrest because they had reasonable cause to believe

14  that the arrest was lawful.  As discussed above, given the factual disputes about whether the arrest

15  for public intoxication was supported by probable cause, summary judgment based on section

16  847(b)(1) immunity is inappropriate.

17      Defendants next argue that the Sheriff's Department defendants are immune from liability

18  under California Government Code section 846.  Section 846 provides in relevant part that

19  "[n]either a public entity nor a public employee is liable for injury caused by . . . the failure to

20  retain an arrested person in custody.  Cal. Gov't Code § 846.  "Courts have routinely applied

21  Section 846 immunity where police officers release someone who then goes on to harm a third

22  party."  *Lum v. Cty. of San Joaquin,* 756 F. Supp. 2d 1243, 1256 (E.D. Cal. 2010) ("*Lum I*")

23  (citing *Santa Barbara v. Superior Court,* 15 Cal.App.3d 751 (1971)) (denying motion to dismiss

24  negligence claim; concluding, *inter alia*, section 846 immunity inapplicable).  In *Lum I*, the court

25  declined to extend Section 846 immunity to public entities and police officers who had released an

26  arrestee with mental health problems who subsequently died by accidental drowning.  Instead, the

27  *Lum I* decision finds that section 846 immunity is confined to situations where a released prisoner

28  subsequently harms a third person:

United States District Court
Northern District of California

1

> The purpose of the statute is to prevent police from over-using their
> arrest power merely to avoid civil liability for harm that results from
> failure to arrest and detain. "[The power to make an arrest] is strictly
> limited and the abuse of such power can result in civil liability. It
> would be contrary to public policy, simultaneously to permit the
> imposition of civil liability for a failure to exercise the power. Hence
> the [§ 846] immunity is a logical adjunct to the public policy." *Lehto
> v. City of Oxnard*, 171 Cal.App.3d 285, 217 Cal.Rptr. 450 (2d
> District, 1985). The court concludes that the purpose of the statute is
> *to provide immunity to the public entity or officer from liability for
> any wrongdoing by a released prisoner that harms a third party*.

*Id.* at 1256–57 (emphasis added). This court agrees with Judge Karlton's reasoning in *Lum I*.

Accordingly, the court finds that section 846 immunity does not apply in these circumstances.

### b.  Whether Defendants Owed Lawman a Duty of Care

Defendants next argue that the arresting officers and Sheriff's Department Deputies did not

owe a duty of care to Lawman, and the circumstances did not establish a special relationship

between Lawman and Defendants that otherwise created such a duty.

The existence of a duty of care is a question of law. *Ballard v. Uribe*, 41 Cal. 3d 564, 572

n.6. Lawman argues that Defendants, as the arresting officers and jailers, owed him a duty of care

arising from the special relationship with him. Lawman cites *Giraldo v. California Department of

Corrections*, 168 Cal. App. 4th 231, 252-53, in which the court held that "there is a special

relationship between jailer and prisoner which imposes a duty of care on the jailer to the prisoner."

The court in *Giraldo* emphasized that "the most important consideration 'in establishing duty is

foreseeability.'" *Id.* at 250.[17]

Lawman also relies on *Lum I*, in which the court held that "[o]fficers and jailers have a

duty to act with reasonable care toward those in their custody." 756 F. Supp. 2d at 1255. In *Lum

I*, the decedent was arrested pursuant to section 647(f). At the time of his arrest, one of the

---

[17] In *Giraldo*, the plaintiff was a male-to-female transgender person who was incarcerated with
male inmates. 169 Cal. App. 4th at 238. She was repeatedly beaten and raped by her male
cellmate, despite her complaints to prison officials and requests to be transferred to a different cell.
*Id.* at 239. The court found that the jailer owed the plaintiff a duty of care in that instance due to
the foreseeability of harm, stating that "[i]t is manifestly foreseeable that an inmate may be at risk
of harm, as [recently enacted legislation] show[s], recognizing the serious problem presented by
sexual abuse in the prison environment." *Id.* at 250. It also noted the vulnerability and
dependence of prisoners, and the protective nature of the relationship between jailers and
prisoners. *Id.*

United States District Court
Northern District of California

arresting officers commented that the decedent, who was under psychiatric care for bipolar disorder, was "probably just off his meds." *Id.* at 1246.  When he was arrested, the decedent "had a laceration on his foot, difficulty walking, vomit on his shirt, and was behaving strangely." *Id.* Although no alcohol was found in the decedent's system, the arresting officers did not take any action to evaluate his physical or mental state. *Id.*  They booked the decedent into the county jail on a "'kickout' charge, meaning that he would be released from jail six hours later." *Id.*  At his booking, the decedent informed an officer of his bipolar disorder and that he took medication, and jail staff later observed the decedent having hallucinations, including "attempting to open imaginary doors and speaking to himself." *Id.*  The decedent also suffered a seizure while in jail. *Id.* at 1247.  The police officers released the decedent about six hours after his arrest, without ever having obtained medical treatment for him or a medical or psychological evaluation of him.  His body was found in the San Joaquin River several days later; the cause of death was accidental drowning. *Id.*

The court in *Lum I* carefully analyzed the reasoning in *Giraldo* and concluded that the jailer-prisoner special relationship is "analogous to law enforcement officers and arrestees," and held that "it is reasonably foreseeable that an arrestee who is in need of medical attention would be at risk in a custodial environment or upon release into a situation made dangerous by his medical condition, or without first having received proper medical attention." *Id.* at 1255.  Accordingly, the court concluded that the defendants owed the decedent a duty of care.

In *Lum I*, there was ample evidence that the decedent was experiencing a mental health emergency during his arrest and incarceration that required medical attention.  In this case, as discussed above, a reasonable jury could conclude that the arresting officers should have known that Lawman had a disability.  However, having a mental disability is not equivalent to having a mental disability that requires immediate medical attention.  Unlike *Lum I*, there are no facts to indicate that Lawman was in medical crisis at the time of his arrest that created a foreseeable risk of harm upon his release.  Moreover, Lawman was triaged at the jail, and he reported that he had no urgent medical condition.  Lawman was observed several times per hour by nurses and deputies and his observation record contains no entries of unusual behavior.  While the decedent in

United States District Court
Northern District of California

*Lum I* was observed hallucinating in his holding cell and suffered from a seizure, here, the only evidence of Lawman's behavior at the jail is M. M.'s observation that Lawman "had peanut butter smeared on him" and "was acting loopy and restless."  Based on these facts, and the absence of evidence that Lawman was actually experiencing a mental health emergency during his arrest and detention, the court cannot conclude that it was reasonably foreseeable that Lawman would be at risk "upon release into a situation made dangerous by his medical condition, or without first having received proper medical attention." *Id.* at 1255.  Accordingly, the court finds that Defendants did not owe Lawman a duty of care.  Therefore, summary judgment is granted as to Lawman's negligence claim.[18]

### 9. Punitive Damages

Lawman seeks punitive damages against Defendants Gordon, Minioza, and Kneuker as to his Fourth Amendment, ADA, section 845.6, Bane Act, and false arrest/false imprisonment claims.   Hr'g Tr. at 58-59.  Defendants argue that there is no evidence from which a reasonable jury could infer "bad intent."  Mot. at 25.

A jury may assess punitive damages under Section 1983 when a defendant's conduct involves "reckless or callous indifference to the federally protected rights of others" without regard to actual intent or malice.  *Smith v. Wade*, 461 F.2d 30, 56 (1983).  Under California law, punitive damages are available if a plaintiff proves "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."  Cal. Civ. Code § 3294(a).  Malice "includes the willful and conscious disregard of the rights or safety of others."  Cal. Civ. Code § 3294(c)(1).

As discussed above, the court grants summary judgment on all claims against Kneuker, and grants summary judgment on Lawman's ADA accommodation claim, section 845.6 claim, and Bane Act claim.  Given that Lawman has raised triable issues as to the legality of his arrest, the court finds that the evidence is sufficient to create a triable issue as whether Gordon and Minioza's conduct during Lawman's arrest meets the requisite federal and state standards for an

---

[18] Because the court concludes that Defendants did not owe Lawman a duty of care, it need not reach Defendants' arguments regarding causation.

1   award of punitive damages.  Summary judgment on punitive damages as to Gordon and Minioza

2   is therefore denied.

3   **III.   MOTION TO AMEND**

4          As noted, Lawman seeks leave to amend his complaint to allege a claim for failure to

5   render medical care under the Fourth Amendment.

6          **A.  Legal Standard**

7          Under Federal Rule of Civil Procedure 15(a), leave to amend should be granted as a matter

8   of course, at least until the defendant files a responsive pleading.  After that point, leave to amend

9   should be granted unless amendment would cause prejudice to the opposing party, is sought in bad

10  faith, is futile, or creates undue delay.  Fed. R. Civ. P. 15(a).  Rule 15(a) provides that the court

11  should "freely give leave when justice so requires."  Fed. R. Civ. P. 15(a).  "This policy is to be

12  applied with extreme liberality."  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051

13  (9th Cir. 2003) (quotation omitted).  In the absence of an "apparent reason," such as undue delay,

14  bad faith, dilatory motive, prejudice to defendants, futility of the amendments, or repeated failure

15  to cure deficiencies in the complaint by prior amendment, it is an abuse of discretion for a district

16  court to refuse to grant leave to amend a complaint.  *Foman v. Davis*, 371 U.S. 178, 182 (1962);

17  *Lockheed Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980, 986 (9th Cir.1999).  These

18  factors do not "merit equal weight," and "it is the consideration of prejudice to the opposing party

19  that carries the greatest weight."  *Eminence Capital*, 316 F.3d at 1052.  "Granting leave to amend

20  does not necessarily mean that the underlying allegations ultimately have merit."  *FlatWorld*

21  *Interactives LLC v. Apple Inc.*, 12-cv-01956-WHO, 2013 WL 6406437, at *3 (N.D. Cal. Dec. 6,

22  2013).  "Rather, '[a]bsent prejudice, or a strong showing of any of the remaining [ ] factors, there

23  exists a *presumption* under Rule 15(a) in favor of granting leave to amend.'"  *Id.* (quoting

24  *Eminence Capital*, 316 F.3d at 1052).

25         **B.  Analysis**

26         Lawman moves pursuant to Rule 15(a)(2) to amend the complaint to add a claim for failure

27  to render medical care under the Fourth Amendment, relying on *Tatum v. City & County of San*

28  *Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006).  Defendants object to the amendment, arguing

1  that the amendment is futile and prejudicial, and that Lawman unduly delayed in seeking leave to

2  amend.

3  　　　　The Supreme Court has held that the Fourteenth Amendment requires the police "to

4  provide medical care to persons . . . who have been injured while being apprehended by the

5  police." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).  In *Tatum*, the Ninth

6  Circuit considered claims of unlawful arrest and excessive force brought by the mother of a

7  suspect who died in police custody shortly after his arrest.   A police officer asked the suspect,

8  whom the officer suspected of being intoxicated or under the influence of a controlled substance,

9  to present identification and to stop kicking a police station door.  *Id.* at 1093.  The suspect refused

10 to comply and attempted to evade the officer's attempts to place him in handcuffs.  After the

11 officer applied a bar arm control hold to force the suspect to the ground, several officers arrived to

12 assist and succeeded in handcuffing the suspect.  *Id.*  The suspect lay on his stomach for about a

13 minute after he was handcuffed, and then the officers positioned him on his side.  About two

14 minutes later, one of the officers requested an ambulance after noticing that the suspect's

15 breathing was heavy and his eyes were bulging, and the suspect's breathing became shallow.  The

16 officer sent a message asking that his request for an ambulance be given priority and the officers

17 continued to monitor the suspect while they waited for the ambulance.  Upon their arrival

18 approximately ten minutes later, the paramedics observed that the suspect was on his back and

19 pronounced the suspect dead at the scene.  The coroner determined that he had died of cocaine

20 toxicity.  *Id.*

21 　　　　The decedent's mother argued that certain aspects of his detention after his arrest

22 constituted excessive force, including the officers' positioning the decedent on his stomach, failure

23 to notice that he had rolled onto his back, and failure to perform CPR.  *Id.* at 1097.  The Ninth

24 Circuit discussed the Supreme Court's holding in *City of Revere* in light of the Court's subsequent

25 decision in *Graham v. Connor*, 490 U.S. 386, 395 (1989), that claims of excessive force by law

26 enforcement officers should be analyzed under the Fourth Amendment, and concluded that claims

27 of deficient post-arrest medical care must be analyzed under the Fourth Amendment.  *Tatum*, 441

28 F. 3d at 1098-99; *see Estate of Cornejo v. City of Los Angeles*, 618 Fed. Appx. 917, 920 (9th Cir.

United States District Court
Northern District of California

1   2015) ("suspects have a Fourth Amendment right to 'objectively reasonable post-arrest [medical]

2   care' until the end of the seizure." (quoting *Tatum*, 441 F. 3d at 1099)).  The Ninth Circuit

3   affirmed the standard for "objectively reasonable post-arrest care" set forth in *Maddox v. City of*

4   *Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986), that "police must seek necessary medical

5   attention by promptly summoning help or taking the injured arrestee to a hospital."  *Estate of*

6   *Cornejo*, 618 Fed. Appx. at 920.  The court in *Tatum* ultimately concluded that "[a]bsent evidence

7   . . . that the officers ignored [the decedent's] deteriorating medical condition . . . it was objectively

8   reasonable for the officers to monitor [his] condition in the manner they did until an ambulance

9   arrived," and that "it was objectively reasonable for [the officers] to request an ambulance for the

10  decedent, rather than performing CPR themselves."  441 F.3d at 1098, 1099 ("Here, the officers

11  promptly requested medical assistance, and the Constitution required them to do no more.").

12          Here, Lawman does not allege that the arresting officers used excessive force, and there is

13  no evidence or allegation that Lawman was "injured while being apprehended by the police."  *See*

14  *Tatum*, 441 F.3d at 1099 (quoting *City of Revere*, 463 U.S. at 244); *see also Maddox*, 792 F.2d at

15  1415 (officers "must seek the necessary medical attention for a detainee when he or she has been

16  injured while being apprehended").  Therefore, it is not clear whether a Fourth Amendment claim

17  based on the arresting officers' failure to render medical care under *Tatum* is sustainable on these

18  facts.  Further, unlike the suspect in *Tatum*, who began to experience difficulty breathing after

19  being handcuffed, there is no evidence or allegation that Lawman's medical condition began to

20  deteriorate during the course of his arrest by Gordon and Minioza.  It is unclear whether Lawman

21  asserts this claim for the period following his arrest.  To the extent Lawman argues that

22  Defendants should have rendered medical assistance during his transportation to County Jail 1, or

23  during his detention in the sobering cell, it is unlikely that the Fourth Amendment would apply to

24  post-arrest conduct.[19]  In any event, the evidence does not support such a claim, as described

25  _____

26  [19] The court notes that Lawman has conceded his Fourteenth Amendment deliberate indifference
    claim.  *See Simmons*, 609 F.3d at 1017-18 ("the Fourteenth Amendment's Due Process Clause . . .

27  applies to pretrial detainees . . . . 'We have long analyzed claims that correction facility officials
    violated pretrial detainees' constitutional rights by failing to address their medical needs . . . under

28  a 'deliberate indifference' standard.'" (citations omitted)).

above.  Therefore, since a claim for failure to render medical assistance under the Fourth Amendment would be futile, the court denies Lawman leave to amend his complaint to plead such a claim.

### IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.  Summary judgment is granted as to Lawman's ADA accommodation claim, California Government Code 845.6 claim, Bane Act Claim, and negligence claim.  The remaining defendants are CCSF, Gordon and Minioza.  Plaintiff's motion to amend is denied.

**IT IS SO ORDERED.**

Dated: February 5, 2015



Donna M. Ryu
United States Magistrate Judge